**TODD KIM**
Assistant Attorney General

**HILLARY HOFFMAN,**
Trial Attorney, MN Bar No. 0402027
hillary.hoffman@usdoj.gov
**KELBY WELSH**
Trial Attorney, D.C. Bar No. 90024480
kelby.welsh@usdoj.gov
United States Department of Justice
Environment & Natural Resources Division
Indian Resources Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
TEL: (202) 598-3147 (Hoffman)
TEL: (202) 341-3380 (Welsh)
FAX: (202) 353-1156

*Attorney for the United States*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>     Plaintiff, <br><br> v. <br><br> ELISEO MONDRAGON <br><br>     Defendant. | Case No. 5:24-cv-1659 |

## **COMPLAINT**

The United States of America, by authority of the Attorney General of the United States and at the request of the United States Department of the Interior, acting on its own behalf and as trustee for the Colorado River Indian Tribes ("Tribes" or "CRIT"),

1

files this complaint and alleges as follows:

## NATURE OF ACTION

1. This is a civil action brought pursuant to the federal common law of trespass and ejectment to remedy Eliseo Mondragon's ("Mondragon" or "Defendant") intentional and unauthorized use and occupancy of land that the United States owns in trust for the benefit of the Tribes and that are subject to federal authority, supervision, and restrictions against alienation.

2. Defendant has repeatedly been notified regarding this trespass and has been ordered to cease and desist from it. Defendant continues to occupy and use the subject trust lands, described in paragraph 7, without right, title, or interest, even after such notifications and orders. Defendant has also unlawfully deprived the Tribes of their right to occupy and use that land.

3. The United States seeks all just and proper remedies against Defendant, including, but not limited to, the following: declaratory relief; damages or mesne profits for the unlawful occupancy and use of the property, and for restoration and remediation of the damaged and degraded property; ejectment; and all costs and fees associated with this action.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of and parties to this action pursuant to 28 U.S.C. §§ 1331, 1345.

5. Venue properly lies in this District, pursuant to 28 U.S.C. § 1391(b), because the subject property, described in paragraph 7, is in the District, and all the alleged acts occurred in the District.

## PARTIES

6. Plaintiff is the United States of America suing on its own behalf and in its capacity as trustee for the Tribes.

7. Defendant currently occupies Lot No. 53 of the Shaggy Tree Subdivision ("Shaggy Tree Lot No. 53"), comprising an area of approximately 0.31 acres. Shaggy

Tree Lot No. 53 is located in the San Bernardino Base and Meridian, Township 3 South, Range 23 East, Section 25, Western Boundary area within the Colorado River Indian Reservation, Riverside County, California (the "Subject Property").

8. Defendant has used and occupied the Subject Property since at least January 1, 2011.

## GENERAL ALLEGATIONS

### A. The Lands at Issue

9. CRIT is a federally recognized Indian tribe residing on the Colorado River Indian Reservation ("Reservation"), which Congress established in 1865. Act of March 3, 1865, 13 Stat. 541, 559. The Reservation straddles the Colorado River ("River")—which serves as the Arizona-California border—with land in both Arizona and California. Originally, the entire Reservation was located to the east, or Arizona side, of the River. The Reservation was subsequently expanded by Executive Orders dated November 22, 1873; November 16, 1874; May 15, 1876; and November 22, 1915.

10. In 1964, Congress affirmed the CRIT Reservation as established and expanded by Executive Order, providing that "unallotted lands of the . . . Reservation . . . are . . . tribal property held in trust by the United States for the use and benefit of [CRIT]." Pub. L. No. 88-302, § 1, 78 Stat. 188, 189 (April 30, 1964) ("1964 Act"). The 1964 Act authorized the Secretary to approve leases of lands on the Reservation, but it initially held in abeyance the Secretary's leasing authority on lands on the California side of the River until such time that those lands were "determined to be within the reservation." Pub. L. No. 88-302, § 5.

11. On January 17, 1969, the Interior Solicitor Edward Weinberg issued a legal opinion in which he determined that the western boundary of the Reservation included a portion of Riverside County, California. Edward Weinberg, U.S. Dep't of the Interior, Opinion Letter on Western Boundary of the Colorado River Indian Reservation (Jan. 17, 1969), *as reprinted in* Opinions of the Solicitor of the Department of the Interior Relating to Indian Affairs 1917-1974 at Vol. II 2096,

3


https://thorpe.law.ou.edu/sol_opinions/p2076-2100.htm. The Secretary of the Interior, Stewart Udall, concurred in the opinion and instructed the Director of the Bureau of Land Management to conduct the appropriate surveys to fix the line of the western boundary of the Reservation. Exhibit 1, Memorandum from the Secretary of the Interior to BLM Director (January 17, 1969) ("1969 Secretarial Order").

12. In 1970, the Secretary of the Interior, Walter Hickel, confirmed Secretary Udall's "final, official, and unqualified declaration that the 'Benson Line' was the proper location of the western boundary of the Reservation." Exhibit 2, Letter from the Secretary of the Interior to CRIT Chairman (June 2, 1970).

13. The Bureau of Indian Affairs ("BIA") then published a notice in the Federal Register that extended the Colorado River Reservation Indian leasing program to "those lands which the Secretary of the Interior has determined, pursuant to the Act of April 30, 1964 (78 Stat. 188), to be within the Colorado River Reservation." Certain California Lands Determined to Be Within the Colorado River Reservation, 35 Fed. Reg. 18,051 (Nov. 25, 1970).

14. The Subject Property is within the exterior boundaries of the lands determined to be within the Reservation as noticed in the Federal Register on November 25, 1970.

**B.     Defendant's Unauthorized Occupation and Use of the Subject Property**

15. After the November 25, 1970, Federal Register notice, the BIA began approving permits to occupy the Reservation lands located west of the Colorado River, including the permit for the Subject Property.

16. CRIT utilized standard-form permits that were approved by the *Resources Development Committee* (RDC), a subcommittee of CRIT's Tribal Council. Each permit was captioned with "Permit No. WB-[XXX] (R) Western Boundary Permit," with "Permit (Homesite)" written below. The date of the RDC's revision is noted in the upper lefthand corner of the permits. Permits with the same revision date take the same form and, apart from identifying information, are identical.

17. Permits with the notation "Revised and Approved RDC 8/21/79" have thirteen numbered pages of text. Pages 1 through 3 include the permittee-specific information. The Articles included therein identify the parties, describe the premises, state the terms of the permit, and list the rental amounts to be paid. Pages 4 through 12 are identical across all permits, articulating the parameters of the permit. Page 13 contains the signature and execution block. Permits identify CRIT as the permitter and includes signature lines for the Permittee, the Tribal Chair, Tribal Secretary, and the BIA Superintendent.

18. Once a permit was executed, it was delivered to BIA's Land, Titles, and Records Office for recordation. A recorded permit contained a nine-digit record number beginning with 603. That number was stamped in black ink and placed in the lower righthand corner of each page. Once the BIA received a permit, it stamped the first and last page with ink, noting the permit was received and identifying the date, time, and location of the receiving BIA office.

19. On April 3, 1980, CRIT issued Permit No. WB-230(R) to Dan Riley. Exhibit 3, Permit No. WB-230(R) ("Permit") at 1. The BIA approved the Permit on May 1, 1980. *Id.* at 13.

20. Article 2 of the Permit states the Subject Property is within the Reservation. *Id.* at 1-2.

21. Article 3 of the Permit authorized the "use and occupancy by the Permittee . . . and [their] immediate family only, <u>for single family residential occupancy</u>." *Id.* at 2.

22. Article 4 of the Permit states the Permit "may be terminated at the end of the initial [one-year] term or at the end of any such successive one-year period by written notice served by the Secretary or the Permittee at least ninety (90) days in advance thereof." *Id.*

23. Article 5 of the Permit states "[t]he Permittee . . . covenants and agrees to pay . . . the amount herein set out . . . or as may be adjusted from time to time," and that "if any installment or rental is not paid on or before the due date, interest at the rate of

12% per annum shall become due and payable and will run until said rental is paid." *Id.* at 2–3.

24. Article 6 of the Permit prohibits the Permittee from placing "permanent improvements" on the Subject Property without first obtaining written consent from CRIT. *Id.* at 3.

25. Article 15 of the Permit states that

> Permittee understands and agrees that this permit shall not be deemed to confer upon Permittee any equity right, title or interest to or in the permitted lands, and further, Permittee hereby relinquishes all past, present or future claims of right, title or interest in, the lands held under this permit or any other lands within the Colorado River Indian Reservation . . . .

*Id.* at 9.

26. Article 18 of the Permit states:

should Permittee default in the payment of any installment or rent or any other sum when due . . . the Secretary . . . may declare this permit forfeited by giving Permittee written notice thereof, and upon such forfeiture, Permittee shall have no further rights or interests hereunder or in or to the permitted premises or any part thereof, and Permitter may re-enter and take possession of the permitted premises and all buildings and improvements thereon, and may cast . . . Permittee and all persons claiming under the permit from the premises.

*Id.* at 10.

27. Article 22 of the Permit states that "[h]olding over by the Permittee after the termination of this permit shall not constitute a renewal or extension hereof or give the Permittee any rights hereunder or in or to the Permitted premises." *Id.* at 11.

28. Article 25 of the Permit states the Permit "and the covenants, conditions, and restrictions hereof shall extend to and be binding upon the successors, heirs, assigns, executors, and administrators of the parties hereto." *Id.* at 12.

6

29. Article 27 of the Permit states, "[s]ubletting or assignment of this permit may be made only with the written consent of all the parties hereto." *Id.*

30. In October 1989, CRIT received the assignment of the Permit from Dan Riley to Gary Van Delden. Exhibit 4, Assignment of Permit from Riley to Van Delden (October 4, 1989). Van Delden agreed to accept the assignment and "fulfill all obligations, conditions, and stipulations contained in" the Permit. *Id.* Both CRIT and BIA approved the assignment to Van Delden.

31. On August 14, 2000, CRIT notified Van Delden that he was in violation of Article 5 of the Permit for failure to pay rent for the years 1995 through 2000. Exhibit 5, Letter from CRIT to Van Delden (Aug. 14, 2000). The total owed by Van Delden in back rent at that time was $13,500. *Id.*; *see* Exhibit 6, Bill (Aug. 8, 2000). The letter instructed Van Delden that he had ten (10) days to show cause as to why his permit should not be canceled for failure to pay rent, and that, if he failed to do so within that time, CRIT would proceed with remedies pursuant to Article 18, including immediate cancellation. Exhibit 5. Upon information and belief, Van Delden did not respond to the August 13, 2000 letter or attempt to show cause why his permit should not be canceled.

32. On January 1, 2011, Van Delden purported to assign "all interest" in the Subject Property to Eliseo Mondragon. Exhibit 7, Assignment of Permit from Van Delden to Mondragon (January 1, 2011). Mondragon accepted "all responsibility for, and agrees to fulfill all obligations, conditions, and stipulations contained in any existing lease agreement between the United States Department of the Interior Bureau of Indian Affairs and Mr. Van Delden in reference to the [Subject Property] . . . ." *Id.* However, neither CRIT nor BIA approved the assignment to Mondragon.

33. On May 13, 2013, CRIT Lease Specialist, Andrea Vernoy, contacted Mondragon via email, instructing him to submit the bill of sale so that she could calculate his back rent and return to him a copy of the lease that CRIT was offering. Exhibit 8, Email from Vernoy to Mondragon (May 13, 2013).

34. On August 7, 2013, Vernoy sent Mondragon a letter informing him that, in the assignment from Van Delden to Mondragon, Mondragon assumed responsibility for back rent owed by Van Delden. Exhibit 9, Letter from Vernoy to Mondragon (August 7, 2013). Included in the letter was a calculation sheet showing that Mondragon owed a total balance of $54,625.00. *Id*. To remedy this matter, Mondragon was informed that he had three options: (1) to remain at the Subject Property, requiring payment of the back rent and transfer fee, and signing a new lease; (2) to "walk away," whereby he would vacate the Subject Property without paying any back rent after signing over any improvements on the Subject Property to CRIT; or (3) to be evicted, with CRIT pursuing back rent, legal fees, and damages. *Id*. Vernoy instructed Mondragon to contact her by August 16, 2013. *Id*.

35. On August 21, 2013, Mondragon responded to Vernoy, stating that although he was willing to sign a lease with CRIT, he was not responsible for back rent from before he accepted assignment of the Permit. Exhibit 10, Letter from Mondragon to CRIT (August 21, 2013). Mondragon indicated that he would pay back rent owed from when he began occupying the Subject Property. *Id*.

36. In response to an email Vernoy sent Mondragon on September 26, 2013, Mondragon reiterated that he would not pay back rent from before he accepted assignment of the Permit because he did not agree to that in the bill of sale. Exhibit 11, Mondragon response to Vernoy (Undated).

37. Upon information and belief, Mondragon continues to illegally use and occupy the Subject Property.

38. Mondragon's unlawful use and occupation of the Subject Property since 2010 has been and continues to be knowing, intentional, willful, and contrary to federal law, and it has deprived the Tribes and Plaintiff of the use and benefits to which they are entitled.

**C.     Legal Basis for Claims against Defendant**

39.     The federal common law of trespass "generally comports with the Restatement of Torts," *United States v. Milner*, 583 F.3d 1174, 1182 (9th Cir. 2009), under which trespass is defined as "the intentional use of the property of another without authorization and without privilege," *United States v. Imperial Irr. Dist.*, 799 F. Supp. 1052, 1059 (S.D. Cal. 1992). Further, "[t]he intent required is simply an intent to be on the land." *Id*.

40.     Under federal common law, remedies for trespass include declaratory relief, damages, and ejectment. *See United States v. Pend Oreille Pub. Util. Dist. No. 1*, 28 F.3d 1544, 1549 n.8 (9th Cir. 1994); *United States v. Torlaw Realty, Inc.*, 483 F. Supp. 2d 967, 973 (C.D. Cal. 2007), *aff'd*, 348 Fed. Appx. 213 (9th Cir. 2009). As stated by the United States Supreme Court, "that an action of ejectment could be maintained on an Indian right to occupancy and use, is not open to question." *Marsh v. Brooks*, 49 U.S. 223, 232 (1850).

41.     Moreover, residential leases on Indian land are governed, generally, by 25 C.F.R. Part 162. The Permit is a residential lease and is governed by these regulations.

42.     BIA's leasing regulations define a trespass as "any unauthorized occupancy, use of, or action on any Indian land or Government land." 25 C.F.R. § 162.003.

43.     Mondragon is required to have a lease to occupy and use the tribal trust properties on the Reservation. 25 C.F.R. § 162.005.

44.     When a lessee remains in possession after a residential lease is terminated, BIA may treat the unauthorized possession as a trespass and take action to recover possession and pursue any additional remedies under applicable law. 25 C.F.R. § 162.371.

45.     Mondragon does not have and has never had an ownership interest in, or a valid lease or permit to, the Subject Property. Therefore, Mondragon's occupancy and

use of the Subject Property constitutes trespass under federal common law and governing regulations.

## FIRST CAUSE OF ACTION

### (Trespass)

46. The United States realleges each of the preceding paragraphs as if fully set forth herein.

47. Since at least January 1, 2011, Defendant has willfully occupied and used the Subject Property without authorization or legal right. Defendant was repeatedly notified of his trespass, including on May 13, August 7, and September 26, 2013. Despite never having an ownership interest in or valid permit to the Subject Property, and despite being offered the opportunity to enter into a new lease with CRIT, Defendant has not done so or vacated the Subject Property.

48. As a result of Defendant's unauthorized and unlawful occupation and use of the Subject Property, he has committed and is now committing a continuing willful trespass on CRIT land that is subject to federal supervision, authority, and restrictions against alienation.

49. As a direct and proximate result of Defendant's continuing and willful trespass, he has damaged and continues to damage the Tribes' trust property and the governmental interests of the United States.

## SECOND CAUSE OF ACTION

### (Ejectment)

50. The United States realleges each of the preceding paragraphs as if fully set forth herein.

51. Since at least January 1, 2011, Defendant has willfully occupied and used the Subject Property without authorization or legal right. Defendant was repeatedly notified of his trespass, including on May 13, August 7, and September 26, 2013. Despite never having an ownership interest in or valid permit to the Subject Property,

and despite being offered the opportunity to enter into a new lease with CRIT, Defendant has not done so or vacated the Subject Property.

52. As a result of Defendant's unauthorized and unlawful occupation and use of the Subject Property, he has unlawfully prevented and continues to prevent CRIT from occupying and using its land, which is subject to federal supervision, authority, and restrictions against alienation.

53. Defendant has defied and continues to defy the authority of the United States, acting through the BIA, to administer the Subject Property. Defendant has refused to comply with the requests that he cease and desist from unlawful occupation and use of the Subject Property.

54. Defendant's continuing occupation and use of the Subject Property is unlawful and, as a direct and proximate result of that trespass, he has damaged and continues to damage the Tribe's and United States' property interests, and he will continue to do so unless and until Defendant vacates the Subject Property or is ejected, and his facilities and equipment are removed from the Subject Property.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the United States of America, respectfully requests that the Court provide the following relief:

a. Declare pursuant to 28 U.S.C. §§ 2201, 2202 that Defendant's willful, unauthorized, and continuing occupation and use of the Subject Property, without the authorization of the Tribes and United States, constitutes a continuing trespass;

b. Enter a judgment for mesne profits or monetary damages caused by Defendant's willful, unauthorized, and continuing occupancy, use, and disturbance of the Subject Property accruing over the last six years and 90 days preceding the date of filing of this Complaint, including, without limitation, the fair rental value of the property, administrative costs, and the costs and expenses of restoring and remediating the damaged and degraded property;

c. Enter a judgment for pre- and post-judgment interest on all damages

awarded from the date of filing of this Complaint until the Judgment is paid in full;

     d.    Eject Defendant from the Subject Property;

     e.    Order Defendant to remove from the Subject Property any and all equipment, personal property, buildings, and other materials placed thereon by them, and abate any damage caused to the Subject Property necessary to restore the property to its natural condition, or, in the alternative, authorize the United States to undertake these tasks, with all costs and expenses incurred by the United States to be paid by Defendant;

     f.    Award the United States all costs of suit to the maximum extent permissible; and

     g.    Grant such other and further relief as the Court deems just and proper.

DATED: August 5, 2024

                                       Respectfully submitted,

                                       TODD KIM
                                       Assistant Attorney General

                                       */s/ Hillary Hoffman*
                                       **HILLARY HOFFMAN**
                                       **KELBY WELSH**
                                       United States Department of Justice
                                     Environment & Natural Resources Division
                                     Indian Resources Section
                                     P.O. Box 7611
                                     Ben Franklin Station
                                     Washington, D.C. 20044-7611
                                     TEL: (202) 598-3147 (Hoffman)
                                     TEL: (202) 341-3380 (Welsh)
                                     FAX: (202) 353-1156
                                     Attorneys for Plaintiff

OF COUNSEL
Karen F. Boyd
United States Department of the Interior
Office of the Solicitor
Indian Trust Litigation Office